FILED
07/08/2024
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 21, 2024

## STATE OF TENNESSEE v. JAYLON LEBRON HILL

**Appeal from the Criminal Court for Hamilton County**
**No. 311512   Amanda B. Dunn, Judge**

_____

### No. E2023-01308-CCA-R3-CD

_____

Defendant, Jaylon Lebron Hill, appeals his Hamilton County Criminal Court convictions for second degree murder, attempted second degree murder, reckless endangerment, and possession of a firearm during the commission of a dangerous felony, for which he received an effective sentence of 23 years' incarceration. On appeal, Defendant challenges the sufficiency of the convicting evidence and the trial court's instructions to the jury. Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Daniel J. Ripper, Chattanooga, Tennessee, for the appellant, Jaylon Lebron Hill.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Coty Wamp, District Attorney General; and Miriam Johnson and Addie Nestor, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Defendant was indicted by the Hamilton County Grand Jury for one count of premeditated first degree murder, attempted first degree murder, reckless endangerment, and possession of a firearm during the commission of a dangerous felony. Following a jury trial, Defendant was convicted of the lesser included offenses of second degree murder and attempted second degree murder, and of the charged offenses of reckless endangerment and possession of a firearm during the commission of a dangerous felony.

On November 30, 2020, the victims, Timothy Taylor and Kimberly Oliver, took Mr. Taylor's daughter to Ruth's Chris Steakhouse to celebrate her birthday. Afterward, they dropped off his daughter at her mother's house, and Ms. Oliver drove the two to "pick up some money" from Ronnie Early, whom they knew as "Stu." When they arrived, a man was standing on the porch. He approached the victims' car, but Ms. Oliver did not open the car window. Mr. Taylor opened the passenger door and told the man that they were waiting on someone. The man said that it was "his house." Mr. Taylor asked the man, "[W]hy are you walking up to the car like you clutching[,]" which Ms. Oliver explained meant carrying a gun. Mr. Taylor told Ms. Oliver to leave. As Ms. Oliver was backing out of the driveway, she heard six to eight gunshots. She continued to drive until she got to a stop sign. She said something to Mr. Taylor, but when she looked at him, he was unresponsive. Ms. Oliver called 911 while she drove Mr. Taylor to the hospital, where he died from his injuries. An autopsy revealed that Mr. Taylor had been shot below the right eye. The bullet traveled through the base of the skull and through the cervical vertebrae and spinal cord, causing instant paralysis. The bullet was recovered from the left side of his neck.

On cross-examination, Ms. Oliver acknowledged that she told police that she did not "get a good look at [the shooter's] face to see certain characteristics that would have stood out." She testified at the preliminary hearing that the shooter was wearing a red hoodie and that the hood was pulled over his head. She testified at trial, however, that "his eyes were very distinctive." Ms. Oliver also told police that the shooter was shorter than her, which she testified was five feet five inches.

Gilberto Perez, a neighbor, saw a person shooting at a car. He said the shooter was wearing black pants and "a purse kind of thing with a strap across his front." He believed the shooter wore a black t-shirt and a black hat, but "it was dark[,]" and he "couldn't really see well."

Mr. Early testified that he lived with Defendant's grandmother, Gloria Hill. He had known Defendant since Defendant was in elementary school, and he had known Mr. Taylor since Mr. Taylor was three or four years old. Mr. Early owed Mr. Taylor $100. When Mr. Taylor arrived to pick up the money, Mr. Early told him to "hold on" while he put clothes on. Mr. Taylor said he would return later, and Ms. Oliver started backing out of the driveway. Mr. Early said, "that's when all the shooting broke out." Mr. Early saw Defendant walk past him and shoot at the victims' car. Mr. Early asked Defendant, "What the hell are you doing?" Mr. Early went inside the house and told Defendant's grandmother, "your grandson just shot that man's car back there." Defendant fled the scene and later called his grandmother. Mr. Early heard Defendant tell his grandmother that he confronted the victims about being at his "granny's house" and told them he had a pistol in his pocket.

Investigators located nine spent shell casings in the yard. A forensic examination of the spent casings revealed that all nine were fired from "the same unknown []9-millimeter caliber firearm." Investigators found a "multi[-]colored M&M jacket" inside the home that contained Defendant's DNA. The jacket and Defendant's hands were tested for gunshot residue and none was found. Investigators found bullet holes in the passenger side of the victims' car and "high velocity" blood spatter inside the car. Among other items, they collected a bag of marijuana and a bag of crack cocaine from the car. There were also bullet holes in the door of a house across the alley from Defendant's grandmother's house.

Defendant gave a statement to police on December 1, 2020. A video recording of the interview was played for the jury. Defendant denied that he had anything to do with the shooting. He said he was 23 years old and that his grandmother had raised him. He said he was only at his grandmother's house for "10 or 15 [minutes]" on the night of the shooting. He was "in the area" and stopped by to see his grandmother. He said his "homegirl" named "Tony" picked him up from his grandmother's house at 10 or 11:00 p.m., and he spent the night at her house.

Defendant said he did not like Mr. Early and did not like him staying at his grandmother's house. He said Mr. Early was a "crack head" and the alley behind his grandmother's house was a "crack area." He said if he saw a crack head, "they gonna have to leave. I tell them to go." He denied that anyone came to his grandmother's house while he was there the night before. He said he was not there long enough "to run anybody off."

Detectives found a Facebook account associated with Defendant by name, photos, and birthdate. The account showed a message sent on December 1, 2020, at 6:08 a.m. to "JD Jackson" that read, "I hit his ass bro my mama called me last night n told me." Jackson responded, "Damn bro, how many times?" Defendant answered that he did not know, and Jackson responded, "Damn lmao" with four laughing emojis. Defendant then sent four laughing emojis. Jackson said, "Bet that n[****] won't try that sh[**] again[.]" Defendant said, "On gang n[****] just don't know it's war season out here[,]" and Jackson responded, "Naw f[or] r[eal]. Be careful out there bro. Got to[o] much love to lo[]se ya to the street[.]" Defendant said, "Fasho bro I gotcha[.]"

Defendant's Facebook account also showed that he used it to make phone calls and send messages to an account profile "BossLadiie Jones," which investigators identified as Tony Jones, on the night of the shooting. At 9:05 p.m., Jones told Defendant that she was "on [her] way[,]" and Defendant responded, "Okay[.]" Detective Colby Barnes of the Chattanooga Police Department recalled that the shooting occurred at approximately 9:17

p.m. Between 9:17 p.m. and 9:20 p.m., Defendant made six calls to Jones, indicating "that they weren't together[.]" Investigators did not interview Tony Jones.

The State introduced an audio recording of a phone call Defendant made from jail to a friend on December 3, 2020. Defendant told his friend that law enforcement "ain't got sh[**]" on him. His friend encouraged him to fight the charges, saying "they got to prove that sh[**], dude." Defendant believed that the first degree murder charge would be dropped to aggravated assault and that he would get "OR'd" or released without a bond. The friend told Defendant he saw the victim's brains in Defendant's grandmother's yard, and Defendant was disappointed the yard had not been cleaned up.

Defendant did not testify or present any other proof.

## *Analysis*

### *Sufficiency of the Evidence*

Defendant contends that the evidence at trial was insufficient to support his convictions. Specifically, Defendant asserts that the proof was "entirely circumstantial and very limited" and that the testimony of the State's witnesses who identified Defendant as the shooter was "all blatantly contradictory." The State responds that the evidence was sufficient to support Defendant's convictions.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this Court is "whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Parker*, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)); *see* Tenn. R. App. P. 13(e). When this Court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)

(quoting *Hanson*, 279 S.W.3d at 275). Circumstantial evidence alone may be sufficient to sustain a conviction. *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When considering the sufficiency of the evidence, this Court shall not substitute its inferences for those drawn by the trier of fact. *Id*.

"The identity of the perpetrator is an essential element of any crime." *Rice*, 184 S.W.3d at 662 (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. *State v. Cribbs*, 967 S.W.2d 773, 779 (Tenn. 1998). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. *Thompson*, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing *State v. Strickland*, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005) (citing *Strickland*, 885 S.W.2d at 87).

To sustain a conviction of second degree murder, the State was required to prove beyond a reasonable doubt that Defendant unlawfully and knowingly killed the victim. T.C.A. §§ 39-13-201, 210(a)(1). "A person acts knowingly . . . when the person is aware that the conduct is reasonably certain to cause the result." *Id*. § 39-11-302(b). A person commits attempt when he knowingly "acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id*. § 39-12-101(a)(3). A person commits reckless endangerment who "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." *Id*. § 39-13-103(a). It is also an offense to employ a firearm during the commission or attempt to commit a dangerous felony. *Id*. § 39-17-1324.

The evidence presented at trial showed that the victims drove to Defendant's grandmother's house, which Defendant said was located in a "crack area," to collect money from Mr. Early, whom Defendant described to police as a "crack head." Defendant told police that he would "run off" any "crack heads" who came to his grandmother's house. Defendant approached the victims' car in a threatening manner and fired nine rounds at the car as they drove away, with one bullet striking Mr. Taylor in the face and killing him.

Shots fired by Defendant also hit the house across alley from Defendant's grandmother's house, placing others in imminent danger of death or serious bodily injury. Mr. Early identified Defendant as the shooter. Defendant admitted that he had been at his grandmother's house on the night of the shooting and told detectives that his friend Tony picked him up. Defendant's Facebook messages showed that at 9:05 p.m., Tony told Defendant that she was on her way. The shooting occurred at approximately 9:17 p.m. Defendant called Tony six times between 9:17 p.m. and 9:20 p.m. The jury could have reasonably inferred that Defendant was waiting on the porch for Tony to pick him up, then after his encounter with the victims, he tried urgently to contact her. The next day, Defendant messaged a friend on Facebook that he "hit his ass[,]" referring to his shooting Mr. Taylor the night before.

The proof was sufficient to sustain Defendant's convictions. Defendant is not entitled to relief on this issue.

*Jury Instructions*

Defendant contends that the trial court erred by giving a jury instruction on Defendant's admissions against interest because the instruction "implies that [ ] Defendant said or wrote something that was, in essence, a statement that negatively impacts [his] own interest[,]" whereas the prior statement instruction "implies that [ ] Defendant merely said or wrote something that was introduced into evidence." The State argues that Defendant has waived the issue by failing to include in the record a transcript of the hearing on his motion for new trial. Waiver notwithstanding, the State argues the trial court properly instructed the jury.

During a jury-out hearing, the trial court announced that it intended to give the "admission against interest" pattern jury instruction. The court stated that it had compared the instruction with the instruction on "confession" and determined that Defendant's statements were statements against his interest. Defense counsel objected to the instruction, "primarily because of the heading that implies [Defendant has] somehow made an admission to this." Defense counsel proposed that the "prior statement of the defendant" instruction "sufficiently cover[ed] it" because Defendant had not "made admissions to anything." The State argued that the "confession" instruction applied to Defendant's Facebook message in which he told his friend that he "hit" the victim.

After a break to research the issue, the trial court determined that Defendant's Facebook message, jail phone call, and statement to police were not confessions but "could potentially be considered admission[s]. . . ." The court asked, "Is there an objection to any of the instructions I've given you, what I believe is the final jury instruction copy, are there any objections at this time?" Neither party expressed any objections.

The trial court instructed the jury as follows:[1]

Evidence has been introduced in this trial of a statement or statements by the defendant made outside of the trial to show an admission against interest. An[] admission against interest is a statement by the defendant that acknowledges the existence or truth of some fact necessary to be proven to establish the guilt of the defendant, or which tends to show the guilt of the defendant, or is evidence of some material fact, but not amounting to a confession. While this evidence has been received, it remains your duty to decide if, in fact, the statement was ever made. If you believe a statement was not made by the defendant, you should not consider it. If you decide the statement was made by the defendant, you must judge the truth of the fact stated. In so determining, consider the circumstances under which the statement was made. Also consider whether any of the other evidence before you tends to contradict the statement in whole or in part. You must not, however, arbitrarily disregard any part of the statement, but rather should consider all of the statement you believe was made and is true. You are the sole judge of what weight should be given such statement. If you decide a statement was made, you should consider it with all other evidence in the case in determining defendant's guilt or innocence.

Addressing the State's waiver argument, the record does not contain a transcript of the hearing on Defendant's motion for new trial. The State asserts that it is therefore unclear whether and to what extent Defendant raised the issue at the trial court level. The State argues that the record is inadequate to show that Defendant properly preserved the issue by stating with specificity at the motion for new trial hearing which jury instruction he now argues was improper. *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . jury instructions granted or refused . . . unless the same was specifically stated in a motion for a new trial[.]"); Tenn. R. App. P. 24 (governing the content and preparation of the record on appeal); *State v. Taylor*, 992 S.W.2d 941, 944 (Tenn. 1999) (holding that the failure to prepare an adequate record for review of an issue results in a waiver of that issue).

In its written order denying the motion for new trial, the trial court's ruling on the issue reads in its entirety:

---

[1] The record before us does not include the written jury instructions. The trial court's oral instructions are quoted here.

In his fifth assignment of error, Defendant argues that the "Court improperly, over the Defendant's objection, charged the jury on certain principles of law." A review of the record in this case establishes that a jury charge conference was held on the record outside the presence of the jury. During the charge conference, no objection was made to any of the proposed instructions on behalf of the Defendant. The Motion for New Trial does not identify the specific instruction given to the jury that was improper. Accordingly, this assignment of error is without merit.

Defendant failed to specifically identify the instruction he claims was improper in his motion for new trial, and the record does not include a transcript of the hearing on the motion. Therefore, Defendant failed to properly preserve the issue. However, because Defendant objected at trial to the admission against interest jury instruction and both parties address the issue in their briefs, the record is sufficient to review the trial court's ruling on the issue.

Defendants have a "constitutional right to a correct and complete charge of the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn.1990). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." *In re Estate of Elam*, 738 S.W.2d 169, 174 (Tenn. 1987); *see also State v. Phipps*, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

In *Helton v. State*, our supreme court defined an admission against interest as:

an acknowledgment by the accused of certain facts which tend together with other facts, to establish his guilt; while a confession is an acknowledgment of guilt itself. An admission, then, is something less than a confession and, unlike a confession, . . . an admission is not sufficient in itself to support a conviction.

547 S.W.2d 564, 567; *see also State v. Kyger*, 787 S.W.2d 13, 23 n. 2 (Tenn. Crim. App. 1989).

The trial court considered Defendant's statements to police, his messages on Facebook, and his jail phone call and determined that they were statements against interest. In his statement to police, Defendant admitted that he was at his grandmother's house on the night of the shooting, that Mr. Early was a "crack head," and that he would run off crack heads from his grandmother's house. In his messages to a friend on Facebook sent

the morning after the shooting, Defendant said that he did not know how many times but that he "hit his ass." In his jail phone call to a friend, Defendant discussed the charges and the strength of the State's evidence. These statements by Defendant, when taken together with other facts, are admissions that tend to establish his guilt. As instructed by the trial court, it was the jury's duty to decide whether the statement was made and the weight to be given the statement. The trial court's instruction was proper. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE